IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 18, 2007 Session

# CURTIS N. ROBINSON, ET AL. V. BAPTIST MEMORIAL HOSPITAL - LAUDERDALE

**A Direct Appeal from the Circuit Court for Lauderdale County**
**No. 5710     The Honorable Joe H. Walker, III, Judge**

---

**No. W2006-01404-COA-R3-CV - Filed August 15, 2007**

---

This appeal arises from a medical negligence case in which a jury verdict was entered in favor of Plaintiffs/Appellees and against Defendant/Appellant Hospital. The Hospital appeals on numerous grounds including: (1) whether the trial court erred in allowing certain evidence in alleged contravention of Tenn. R. Civ. P. 26.05 and 37.03, (2) whether the trial court erred in not granting the Hospital's motion for new trial on the grounds of alleged inappropriate and inflammatory comments and arguments by opposing counsel; and (3) whether there is material evidence to support the jury's verdict. Finding no error, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court is Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

James L. Kirby and Timothy D. Patterson of Memphis, Tennessee for Appellant, Baptist Memorial Hospital-Lauderdale

Charles M. Agee, Jr. of Dyersburg, Tennessee for Appellees, Curtis N. Robinson and Shirley Robinson

**OPINION**

Curtis N. Robinson (together with his wife, Shirley Robinson, the "Robinsons," "Plaintiffs," or "Appellees") became totally disabled and began drawing Social Security disability in 1990. Mr. Robinson suffers from numerous medical problems including: (1) diabetes, (2) severe neuropathy (nerve pain), including a nearly complete loss of feeling in his legs and feet, (3) dizziness and balance problems, (4) toe, feet, heel, and ankle sores, blisters, decubitus ulcers dating as far back as 1990, (5) vision problems, which required three surgeries to his right eye and approximately five surgeries to his left eye, (6) osteomyletis (weakness in the bones) and severe osteoporosis, (7) heart problems, including at least three heart attacks.

On February 11, 2002, Dr. Carl Huff admitted Mr. Robinson to Baptist Memorial Hospital–Lauderdale (the "Hospital," "Defendant," or "Appellant") to perform surgery for a fractured left hip. Dr. Huff discharged Mr. Robinson from the Hospital on February 25, 2002. Dr. Huff's discharge orders indicate that Mr. Robinson's condition is "good," that Mr. Robinson should undergo outpatient physical therapy, and that Mr. Robinson should see Dr. Huff for follow-up in approximately four weeks

Following his discharge from the Hospital, Mr. Robinson did not follow Dr. Huff's orders to undergo physical therapy. Rather, Mr. Robinson testified that he spent approximately eighty percent (80%) of his post-operative time in his recliner and approximately twenty percent (20%) of his time in bed. Mr. Robinson's next scheduled appointment with Dr. Huff was on March 15, 2002. Dr. Huff's medical record for that visit states that "patient reports decubiti on both heels." Although Dr. Huff testified that he first noticed the pressure sores on Mr. Robinson's heels the day of discharge from the Hospital, there are no written notes in the discharge summary concerning Mr. Robinson's heels. The first notation concerning the ulcers is that contained in the medical record of March 15, 2002. On or about April 5, 2002, Dr. Huff dictated a discharge summary for Mr. Robinson's hospital stay, which ended on February 25, 2002. In his dictation, Dr. Huff notes that, despite normal precautions, Mr. Robinson developed decubiti while in the Hospital.

On or about March 12, 2002, Mr. Robinson saw his primary care physician, Dr. Scrivastava. Dr. Scrivastava diagnosed Mr. Robinson with bilateral decubitus ulcers, which were gangrenous. Dr. Scrivastava referred Mr. Robinson to Dr. Roy Chu at the Wound Care Center in Dyersburg, Tennessee. Dr. Chu testified that the Wound Care Center deals with difficult wounds that a primary care physician may not have the expertise or the facility to treat as an outpatient. Dr. Chu testified that Mr. Robinson had developed necrotic, infected ulcers on the posterior aspects of both heels as a result of his February 2002 Hospital stay. Dr. Chu treated Mr. Robinson with an antibiotic to protect him from systemic bacteria invasion and scheduled him for outpatient surgery to remove the dead tissue on March 21, 2002. The follow-up care required several visits to the Wound Care Center for additional surgical debridements of the dead tissue, antibiotic therapy, and pain management.

In June 2002, Mr. Robinson suffered a calcaneus fracture of his right heel. Dr. Huff treated Mr. Robinson for this injury. In Dr. Huff's office note of December 12, 2002, he reports that Mr. Robinson's ulcers are healed; however, Dr. Huff could not testify as to the exact date that the wounds were healed.

On January 27, 2003, the Robinson filed their Complaint against the Hospital. The Complaint reads, in pertinent part, as follows:

> (5) While plaintiff, Curtis N. Robinson, was a patient in the hospital, the agents, servants and/or employees of defendant...failed to provide the proper care and treatment for the plaintiff, and failed to follow proper hospital policy and protocol so as to reduce or eliminate the risk of the plaintiff having bed sores and circulation problems. As a

result of their failure to properly care and provide for the plaintiff, Curtis N. Robinson, the pressure on his heels caused blisters and later an infection, which almost turned into gangrene.

(6) As a result of the negligence of the servants, agents and/or employees of the defendant, plaintiff, Curtis N. Robinson, was required to undergo additional surgeries on his feet at the Methodist Hospital of Dyersburg on or about March 21, 2002, by Dr. Roy Chu and on or about June 20, 2002, and June 27, 2002, by Dr. Carl Huff.

(7) The plaintiffs allege that the defendant was negligent and its servants, agents and/or employees deviated from the standard of care and skill expected and required of them in the same or similar community and that it was this negligence, which was the direct and proximate result of the injuries and damages caused to the plaintiff....

Mr. Robinson sought $500,000.00 in damages; Mrs. Robinson sought $100,000.00.

On March 21, 2003, the Hospital filed its Answer, in which it denies the material allegations of the Complaint. On the same day, the Hospital propounded Interrogatories and Requests for Production of Documents on the Robinsons. The Robinsons served their Answers to Interrogatories and Requests for Production of Documents on the Hospital's counsel on July 7, 2003. During the course of discovery, the Robinsons identified Dr. Carl Huff as one of their expert witnesses along with the facts and opinions to which he would be called to testify. The Hospital took Dr. Huff's deposition on April 18, 2005.

Prior to the trial in this case, the Hospital filed a Motion in Limine on February 10, 2006, seeking to exclude certain testimony, including:

Any testimony, evidence, questioning or argument from the plaintiffs and their witnesses concerning any deviation from the standard of care or concerning the cause of any injuries to the plaintiff, other than the opinions previously disclosed in the discovery deposition of the plaintiff's expert witnesses, Dr. Carl Huff and Dr. Roy Chu. This includes any new opinions of Dr. Huff concerning the cause of the plaintiff's calcaneus fracture, which were not disclosed in his discovery deposition on April 15, 2005 [sic], and any other new opinions that were formed after his deposition.

Following arguments, the trial court denied the Hospital's motion.

The case was tried to a jury from February 27, 2006 until March 1, 2006. The jury returned a verdict finding for Mr. Robinson in the amount of $300,000.00 and for Mrs. Robinson in the

amount of $50,000.00. On March 1, 2006, the trial court entered a judgment on the jury verdict. On March 30, 2006, the Hospital filed a Motion for New Trial or in the Alternative for a Remittitur. On April 7, 2006, the Robinsons filed their response. On May 25, 2006, the Hospital filed an Amended and Corrected Motion for New Trial or, in the Alternative, for Remittitur.[1] On May 30, 2006, the trial court entered an Order denying the motion for new trial and denying the motion for remittitur. The Hospital appeals and raises three issues for review as stated in its brief:

> 1. Whether the trial court erred in allowing Plaintiff's expert to testify at trial as to new and changed opinions and facts that were not disclosed in discovery.
>
> 2. Whether the trial court erred in overruling Defendant's Motion for New Trial when Plaintiffs' counsel repeatedly made arguments and statements to the jury that were prejudicial, improper, and not supported by the evidence, and which denied Defendant a fair trial.
>
> 3. Whether there is material evidence to support the Plaintiffs' theory at trial that the Defendant was liable for corporate negligence or the amount of damages awarded.

**Dr. Huff's Testimony**

On appeal, the Hospital asserts that the trial court erred in denying its Motion in Limine to exclude any portion of Dr. Huff's testimony that contained new and/or changed opinions that were not disclosed during discovery. Specifically, the Hospital alleges three points of error in Dr. Huff's trial testimony. First, the Hospital asserts that Dr. Huff's testimony concerning the applicable standard of nursing care and the possible deviation therefrom is outside the scope of his discovery deposition. Next, the Hospital asserts that the trial court should not have allowed Dr. Huff to testify about seeing Mr. Robinson's heel ulcers at the time before his discharge from the Hospital. Finally, the Hospital contends that Dr. Huff's trial testimony concerning the cause of the June 2002 heel fracture should not have been allowed. As the basis for error, the Hospital asserts that these portions of Dr. Huff's trial testimony are outside the scope of his discovery deposition The Hospital contends that it received no notice of any change, or supplementation, to the opinions espoused by Dr. Huff in his deposition. Consequently, by allowing Dr. Huff to testify outside the scope of his deposition, the Hospital asserts that the trial court allowed a violation of Tenn. R. Civ. P. 26.05 to go without sanctions. Tenn. R. Civ. P. 26.05 reads, in relevant part, as follows:

> A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the

---

[1] As required by Tenn. R. App. P. 3(e), all issues raised in this appeal were set out in the amended motion for new trial.

response to include information thereafter acquired, except as follows:

(1) A party is under a duty seasonably to supplement the party's response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of that testimony.

(2) A party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which the party (A) knows that the response was incorrect when made, or (B) knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

Tenn. R. Civ. P. 37.03 states, in pertinent part, that:

A party who without substantial justification fails to supplement or amend responses to discovery requests as required by Rule 26.05 is not permitted, unless such failure is harmless, to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court on motion may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses (including attorney fees) caused by the failure, these sanctions may include any of the actions authorized under Rule 37.02(A), (B), and (C) and may include informing the jury of the failure to supplement or amend.

In the instant case, the Hospital contends that the portions of Dr. Huff's testimony discussed above should have been excluded from the evidence at trial under Tenn. R. Civ. P. 37.03 because the Robinsons allegedly failed to comply with Tenn. R. Civ. P. 26.05.

Under Tenn. R. Civ. P. 26.05(1), the Robinsons are required to supplement Dr. Huff's responses only as to "any question directly addressed" at the deposition. If Dr. Huff's answers to any question directly addressed at the deposition have significantly changed from discovery to trial, then we must determine whether the change is substantial enough to warrant further disclosure under Tenn. R. Civ. P. 26.05. If so, then we must determine whether such disclosure or supplementation was made. If not, then we must determine whether the trial court erred in not excluding the testimony from trial and/or in not imposing sanctions as allowed under Tenn. R. Civ. P. 37.03. Before addressing these question, however, we must also note that the trial court is afforded wide discretion in the admission or rejection of evidence, and the trial court's action will be reversed on

-5-

appeal only when there is a showing of an abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn.1992); *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn.Ct.App.1995). The abuse of discretion standard requires us to consider: (1) whether the decision has a sufficient evidentiary foundation; (2) whether the trial court correctly identified and properly applied the appropriate legal principles; and (3) whether the decision is within the range of acceptable alternatives. *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn.Ct.App.2000). While we will set aside a discretionary decision if it does not rest on an adequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative.

Testimony regarding the standard of care

In their supplemental answer to the Hospital's first set of interrogatories, the Robinsons list Dr. Huff as one of their potential experts and divulged the scope of his testimony as follows:

> 2. Dr. Carl W. Huff
>
> *                         *                         *
>
> Dr. Huff is a board certified orthopedic surgeon. Dr. Huff was the surgeon that admitted Mr. Robinson to the Baptist Memorial Hospital–Lauderdale for a displaced intertrochanteric fracture of the left hip. Dr. Huff is expected to testify that while Mr. Robinson was a patient at Baptist Memorial Hospital–Lauderdale from February 11, 2002, thr[ough] February 25, 2002, he developed lesions caused by prolonged pressure due to the lack of proper care of the hospital staff at Baptist Memorial Hospital–Lauderdale. Further, Dr. Huff is expected to testify as to his treatment of Mr. Robinson's heels.

The Hospital, then, was put on notice that Dr. Huff would be called as an expert to testify about the alleged "lack of proper care of the hospital staff...." In his discharge summary (which was dictated on April 5, 2002), Dr. Huff states, *inter alia*, that "[i]n spite of all normal precautions, he [Mr. Robinson] did develop decubitus on both heels." At the April 18, 2005 deposition, counsel for the Hospital questioned Dr. Huff concerning his opinion that the nurses took "normal precautions" in their care of Mr. Robinson, to wit:

> Q. So is it your position that normal precautions were taken at the hospital?
>
> A. Well, perhaps normal precautions, but for a patient of this susceptibility maybe it should have been extraordinary precautions.
>
> *                         *                         *

-6-

Q. All right. But you do agree that normal precautions were taken–

A. I agree with–

Q. –by the hospital?

A. –that, yes, sir, I do. I agree with that. Absolutely.

Q. What do you call extraordinary precautions?

A. Having some kind of protector over the heel that prevents contact of the heel with the bed or any other surface.

*                              *                              *

Q. Do you agree that if normal precautions were taken, that the nurses carried out the nursing responsibilities that nurses ordinarily do?

A. Well, I see your point, and there is certainly a valid statement to make. But I guess the thing about it, decubiti occurred, so that means there was pressure on the heels for an extended period of time.

So, it isn't–I mean, it happened. So by definition there was too much pressure on his heels during the time he was there.

Q. Is it your belief that if an injury occurs, that that automatically means that someone at the hospital deviated from the standard of practice that they should have followed?

A. I think that the presence of a heel decubitus by definition is–means that there was a deficiency of care.

*                              *                              *

Q. If you're going to testify that nurses deviated from the standard of practice that the nurses should have followed–and I'm not sure you are since we've talked about this normal precautions that they took, but if you have any criticisms of the nurses, I'd like for you to point that out to me in the medical record.

A.  The only criticism I have is that the decubiti or the pressure sores occurred while he was in the hospital.  That's the only criticism I have.

*                          *                          *

Q.  Is the only basis for your opinion that the nursing care was somehow deficient the fact that he developed, at some point in time, decubitus ulcers?

A.  That's correct.

*                          *                          *

Q.  Have you told me all the opinions that you have about the nursing care and the basis for those opinions?

A.  Yes, sir.

At the deposition, counsel for the Robinsons asked Dr. Huff the following, relevant, questions regarding the nursing care:

Q.  Okay.  And you indicated that with 20/20 hindsight maybe there should have been extra precautions for this patient, correct?

A.  Right.

Q.  But these wounds–do these wounds occur without–do these wounds occur if the nurses that are there 24/7, if they are alert and perform their duties to relieve pressure on the area of his heels?

A.  No, sir.

Q.  They wouldn't occur, is that correct?

A.  No, sir.

Q.  So you believe that based upon a reasonable degree of medical certainty this was a deviation away from the standard of care that you would expect nurses to provide [] proper nursing care at the hospital in this–in the Ripley community?

MR. KIRBY: Objection to the leading.

-8-

A. (The witness) Yes, sir.

At the trial, Dr. Huff's relevant testimony concerning the nursing care was as follows:

Q. ...[F]rom the time he [Mr. Robinson] was admitted until the time he was discharged on the 25th, do the nurses on a regular basis, or should nurses on a regular basis go into the patient's room and provide assessments and provide nursing care to that patient?

A. Yes, sir.

Q. All right. Would that be the standard of nursing care in the Ripley area back in February of 2002, to do that?

A. Yes, sir.

Q. And what sort of things would a nurse–let's say on February 14th, after he got moved to the swing bed, what sort of things would a nurse–would you expect to see in the patient's chart that a nurse was doing?

MR. KIRBY: Your Honor, I have an objection.

THE COURT: All right, sir.

MR. KIRBY: May we approach?

THE COURT: Yes, sir.

(A bench conference was held on the record, in the presence of the jury but out of the hearing of the jury and the following proceedings were had.)

MR. KIRBY: They're going into new opinions that have never been disclosed. There has never been a disclosure that Dr. Huff was going to testify about what nurses should do on these examinations or evaluations or how often they should visit or any such thing as that.

Dr. Huff, in his deposition, said his only opinion was that the nursing care was deficient because there were heel ulcers. He had no other basis for any opinions. And now we're hearing new

information. And I asked in his deposition did he have any other opinions whatsoever related to this case, and he said none.

THE COURT: Mr. Agee.

MR. AGEE: Judge, I think he's–I don't think this is any kind of surprise. We're not asking him to give any different opinion than what he's always given. He was never asked this question in his deposition. And, you know, for Mr. Kirby to make a shotgun question, Do you have any other opinions about this case, obviously wouldn't be addressing general issues of medicine and what happens in a hospital setting.

THE COURT: All right. The objection will be overruled to the question as asked. The Court will allow him to respond.

\*                                  \*                                  \*

Q. Okay. Dr. Huff, just briefly, you testified that nurses in hospital settings, in-patient post-surgical patients, nurses come in the rooms and provide–look at the patient. What do they do in there, generally?

A. Well, what I understand about nursing care is a care plan is established, and then they will follow through with that. Each patient has different needs, of course. And then they will chart pertinent things that reflect what they observe and what was done.

\*                                  \*                                  \*

Q. Okay. Now, Dr. Huff, do you have an opinion based upon a reasonable degree of medical certainty whether it was necessary for Mr. Robinson, a postoperative patient, to have been cared for by the nursing staff so as to not develop any trauma to his heel area or to his feet?

[Objection by defense counsel to leading–overruled].

A. Well, in Mr. Robinson's case he sustained a decubitus ulceration of both heels, and this was caused by pressure on his heel from laying in bed without adequate relief of this pressure and monitoring of the results of this pressure. And he did sustain this ill effect from his hospital stay.

-10-

Q. Okay. Then, is it your opinion, based on your review of the records and your examination of your patient, that he developed a condition that was in both heels while a patient at the hospital, that was caused by prolonged pressure on those heels?

[Objection by defense counsel to leading–overruled].

A. Yes, sir....

*                           *                           *

Q. Is there any doubt...that the medical condition you described as pressure sores or decubitus ulcers on both heels, is there any doubt in your mind that they were caused from prolonged pressure while he was at the hospital?

A. That's how it happened.

Q. Okay. And do you have an opinion based upon a reasonable degree of medical certainty whether or not that condition can occur in a hospital setting absent a deviation from the standard of nursing care required in this area?

A. It couldn't have happened without that breach.

In comparing the testimony adduced at Dr. Huff's deposition with that had at the trial, we cannot conclude that Dr. Huff changed his initial opinion or testimony regarding either the standard of care required in Mr. Robinson's case, or the nursing care that was actually rendered, to such an extent as to rise to the level of trial by surprise or ambush. Throughout his testimony Dr. Huff maintains that the particular heel injuries with which Mr. Robinson presented, could not have occurred but for the application of prolonged pressure at those points (a fact that Dr. Chu corroborates). Although we concede that an injury, in and of itself, is not, *ipso facto,* proof of negligence (a legal conclusion which the jury was admonished not to reach), a close reading of Dr. Huff's testimony reveals that his position, in both his deposition and trial testimony, remained materially unchanged. The gravamen of Dr. Huff's testimony is that, given Mr. Robinson's particular health issues (i.e. neuropathy brought about by severe diabetes), so called "normal precautions" to relieve pressure were not sufficient in this case. Furthermore, because these particular heel ulcers that Mr. Robinson developed were directly caused by prolonged pressure on that area, the nurses, although they provided normal care and precautions in this case, did not provide those protections reasonably required by a patient with Mr. Robinson's known physical condition (i.e. extraordinary precautions).

Testimony regarding when Dr. Huff first noticed the heel injuries

Turning to Dr. Huff's testimony regarding when he first noticed Mr. Robinson's heel injuries, in his April 18, 2005 deposition, Dr. Huff testifies that he examined Mr. Robinson's heels when he was admitted to the Hospital and that, at that time, the heels "were normal." However, at the time Mr. Robinson was discharged from the Hospital, Dr. Huff testifies that he saw the beginning stages of the ulcers, to wit:

> Q [to Dr. Huff]: All right. What do you remember seeing on Mr. Robinson's heels before he left the hospital?
>
> A. They were black.
>
> Q. Can you be more specific?
>
> A. The area of skin over the heels was black.
>
> Q. There can be different shades of black. How would you characterize the blackness of his heels?
>
> A. Very black.
>
> Q. Okay. What size?
>
> A. I'd say three centimeters across.
>
> Q. Okay. Was the skin intact?
>
> A. Yes. Yes, it was intact, and no drainage or anything. So, I mean, you always hope that...underneath maybe it's not full thickness loss, maybe it will be okay, maybe it will heal. You just have to wait and see...how it develops. Progresses.
>
> Q. With the skin intact you cannot call it a decubitus ulcer at that time, can you?
>
> A. No you cannot. It's impending. It would be an impending decubitus. That's true.
>
> Q. What did you call it–or what did you consider it to be when you saw his heels on February 25?
>
> A. Pressure sores. Pressure areas.

From this testimony, the Hospital was put on notice that Dr. Huff would likely testify at trial that Dr. Huff had noticed the black areas on Mr. Robinson's heels on February 25, 2002. At trial,

-12-

Dr. Huff maintained his position that he noticed the heel abrasions prior to discharging Mr. Robinson from the Hospital; however, he also testified that Mr. Robinson and his wife had "dropped by" his office a day or two after Mr. Robinson was released from the Hospital to show Dr. Huff the black areas on Mr. Robinson's heels. Dr. Huff recalled that he told Mr. Robinson, both before he left the Hospital and when he and Mrs. Robinson dropped in at the office, to see Mr. Robinson's primary care physician. Although not contained in the deposition, Dr. Huff's added testimony at trial that he had also seen the heel injuries a day or two after Mr. Robinson's discharge from the Hospital did not prejudice the Hospital's case. The Hospital knew, or should have known, from the interrogatory response and from the deposition testimony, that Dr. Huff would testify (as he did) that the heel injuries were apparent before Mr. Robinson left the Hospital on February 25, 2002. Given this pre-trial information, the Hospital was given notice that it should be prepared to defend against the allegation that the heel ulcers were present at the end of Mr. Robinson's Hospital stay. The fact that Dr. Huff testified about the drop-in visit at the office two to three days after February 25, 2002 does not put a greater burden on the Hospital's case than Dr. Huff's testimony that he saw the injuries on February 25, 2002.

Testimony regarding the June 2002 heel fracture

Turning to the calcaneus fracture Mr. Robinson suffered in June of 2002, Dr. Huff testified that he was Mr. Robinson's treating physician for this injury. Concerning the injury, in his deposition testimony, Dr. Huff testifies, in relevant part, as follows:

> Q. You mentioned something about a calcaneus fracture?
>
> A. Yes, sir.
>
> Q. Had Mr. Robinson fractured a heel?
>
> A. Yes, sir.
>
>     *                            *                            *
>
> Q. How did he fracture that heel?
>
> A. He was walking on his driveway and took a misstep, and came down hard on his foot.
>
> Q. Was that because of his neuropathy?
>
> A. Well, I feel like that he didn't have normal feeling, and would have some bearing on it, yes, sir.

Q. Have you seen any note about him at one time walking on a hot pavement?

A. I think that's when it happened, actually?

Q. Was he barefoot?

A. I think he was.

Q. He was barefoot, and because of his neuropathy he could not feel the heat, that it was blistering his feet?

A. I'm sure that he would not have be able to feel the heat.

Q. Is his neuropathy severe?

A. Yes, sir.

Following the deposition, the Robinsons' attorney followed-up with Dr. Huff regarding the possible causal link between the decubitus ulcers and the calcaneus fracture. Dr. Huff sent a letter dated May 17, 2005 to the Robinsons' attorney. The letter reads, in pertinent part, as follows:

> I would like to respond to your question regarding the decubiti involving the heels of Mr. Curtis Robinson. He underwent a[n] open reduction and internal fixation of the left hip on 2/11/02 and during the course of his hospital stay he developed decubiti in both heels that required extensive treatment and were open wounds for some time. He was treated in the wound care clinic at Dyersburg. On 6/21/02 he was at home and twisted his right heel rather violently on or about 6/18/02. On the day of admission he simply took a step and the whole heel area opened up like a book and there was an obvious displaced fracture along the longitudinal axis of the calcaneus. This was an open fracture because the fracture occurred right through the area of the decubitus which was already open. Therefore the fracture itself would otherwise have been a closed fracture but due to the presence of the decubitus it was therefore an open fracture. The calcaneus was considered to be weakened as a result of the decubitus. Because of the decubitus the patient was not as ambulatory as he would have been and disuse osteoporosis of the calcaneus would have weakened the bone. In addition when there is an opened area the circulatory dynamics will change and increase the local metabolism which would tend to increase the turnover of the bone. As you know at the posterior heel the calcaneus is a subcutaneus bone that there are

no tissues between the skin and the bone except for the subcutaneous fat. The association of the calcaneal fracture with the decubitus is indirectly implied by the fact that the fracture was exactly at the level of the decubitus. The patient was not really able to ambulate with all the protective bracing that he would normally have utilized were it not for the decubitus. Therefore if you look at all the factors involved were it not for the decubitus the patient very likely would not have sustained the injury and fracture to the calcaneus.[2]

At the trial of this matter, in his direct examination, Dr. Huff testified, in relevant part, as follows concerning the cause of the June 2002 heel fracture, to wit:

Q. And do you have an opinion, Dr. Huff, based upon a reasonable degree of medical certainty whether or not the heel fracture would have occurred had it not been for the decubitus ulcer?

A. Well, I think his [Mr. Robinson's] condition of his bone was compromised from his prolonged inactivity, which weakens bone, plus the infection there, the removal of tissue, and increase in circulation would tend to weaken the bone.

Q. Okay. Was it [the fracture] also at the exact site or where his decubitus ulcer was?

A. Yeah, the fracture, the fracture line went right across the middle of the decubitus.

*                         *                         *

Q. Then again, just for clarity in the record, is it your opinion based upon a reasonable degree of medical certainty that the fracture to the heel calcaneus bone and the medical treatment necessitated by such an injury are all directly related to the decubitus ulcer on that heel?

MR. KIRBY [counsel for the Hospital]: Objection to leading?

THE COURT: The Court will allow the question.

---

[2] The Robinsons' attorney claims that he sent a copy of Dr. Huff's letter, along with a cover letter dated June 1, 2005, to the Hospital's attorney thereby noticing them of Dr. Huff's additional, or supplemental, opinion that Mr. Robinson's heel fracture was causally linked to the ulcers he allegedly developed in the Hospital. Although Dr. Huff's letter was admitted into evidence, *see infra*, the June 1, 2005 cover letter is not a part of the record on appeal.

A.  Yes, sir.

On cross-examination, counsel for the Hospital questioned Dr. Huff concerning the cause of the calcaneus fracture, in relevant part, as follows:

> Q.  Let me hand you this letter [Dr. Huff's May 17, 2005 letter, *supra*] Dr. Huff.  Before you look at that, you will remember that in your deposition...when I asked you how he fractured his calcaneus bone in his heel and you told me about stepping down hard on the pavement.  And then, after your deposition–do you have the letter in front of you?
>
> A.  Yes, sir.
>
> *                                    *                                    *
>
> Q.  Well, your letter of May 17, 2005 considerably changed your opinion about the cause of the calcaneus fracture.  Do you agree with that?
>
> A.  I don't understand what you mean.
>
> Q.  Well, let me back up.  In the video clip we've now seen twice, when you were asked, "How did he fracture his heel?" what caused it?
>
> A.  Again, I was trying to recall from memory.
>
> Q.  I understand.  And you told me that you jogged your memory for the first time since your deposition this morning, when you read your discharge summary.
>
> A.   I read the actual document where I had written what had happened.
>
> *                                    *                                    *
>
> Q.  But everything you said in court today is in your letter of May 17, 2005, changing your opinion to try to–
>
> A.  Well, where is my–

Q. Let me finish–to try to connect the calcaneal fracture in the heel to the sores he had on his heels. First time this showed up, right?

A. Where do you see that I changed my mind or changed my opinion? Can you show me that?

Q. This is the first time it appears where you say the calcaneus was weakened as a result of the decubitus, referring to the sores. And because of the sores, the patient was not as ambulatory and he got disuse osteoporosis of the calcaneus and a weakened bone. And you talk about the circulatory dynamics, and you try to relate it for the first time ever to the heel sores. And you did that on May 17, 2005, after you were contacted on behalf of the Plaintiff, correct?

A. That doesn't–

Q. Sir, am I correct?

A. This is supplemental information. It doesn't contradict. It's background information that occurred leading up to this incident. This doesn't represent any kind of changing of my mind or a different opinion.

\*                                        \*                                        \*

Q. Dr. Huff, let me go back to my question. When I took your deposition and asked you what caused the fracture of the calcaneus, you only said what was in the video clip, that he misstepped and came down hard on his heel. We've seen the video. We can all agree what that said, right?

A. Right.

Q. All right. You said nothing about any connection between the calcaneal fracture and the sores in your deposition when you were asked what happened.

A. Well, if I had been asked the question, I would have said it. All I was asked was–we were talking about the mechanism of injury. We weren't talking about the pathophysiology that created a pathological fracture, with less than the usual amount of trauma that it takes to fracture a calcaneus.

-17-

Q. But after your deposition you felt compelled to generate a long answer in this letter, trying to connect it, and that was after you were contacted by the Plaintiffs?

A. I'm telling you, this was a pathological fracture. This was not your ordinary calcaneal fracture. I've never seen a fracture like this–

Q. Yes, sir.

*                            *                            *

MR. KIRBY [counsel for the Hospital]: All right. I'd like to mark that [Dr. Huff's May 17, 2005 letter] the next exhibit, please.

(Exhibit No. 4, Letter dated 5/17/05, was marked and admitted as evidence.)

On appeal, the Hospital asserts that the Robinsons' attorney failed to supplement Dr. Huff's deposition testimony with his allegedly new opinions concerning the cause of Mr. Robinson's heel fracture. As noted above, *see* fn. 2, the Robinsons' attorney asserts that he sent a copy of Dr. Huff's letter to opposing counsel immediately after receipt of same. Given the fact that the cover letter from the Robinsons' counsel is not part of the record on appeal (it is only contained in the appendix to the Robinsons' brief), we cannot know for certain whether, or when, the Hospital received Dr. Huff's May 17, 2005 letter. As discussed above, the trial court did not grant the Hospital's Motion in Limine, which contained, *inter alia*, a request to exclude any testimony by Dr. Huff "concerning the cause of the plaintiff's calcaneus fracture, which were not disclosed in his discovery deposition...." Counsel for the Robinsons contends that the Motion in Limine was denied, *inter alia*, because he sent a copy of Dr. Huff's letter to opposing counsel well in advance of trial. The record contains only the Hospital's Motion in Limine. There is no transcript of the hearing on the motion, nor is the Order granting same included in the record before us. Because our review is limited to the record on appeal, and in the absence of these documents, we cannot conclude that the trial court abused its discretion in denying the Motion in Limine.

Regardless of the grant or denial of the Hospital's Motion in Limine, the record before us does not support a finding that the trial court's allowing Dr. Huff's testimony concerning the cause of the heel fracture rose to the level of reversible error. During Dr. Huff's direct examination, *see supra*, the Robinsons' attorney first questions Dr. Huff about the cause of the heel fracture. The Hospital contends that this line of questioning constitutes trial by ambush, and yet the only objection raised is to leading. Tenn. R. Evid. 103 states, in relevant part, that:

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected, **and**

(1) *Objection*. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, **stating the specific ground of objection** if the specific ground was not apparent from the context....

(Bold type added for emphasis).

As discussed above, the specific objection to this portion of Dr. Huff's testimony was to leading. Now, on appeal, the Hospital asserts that their objection is to the content of Dr. Huff's testimony as opposed to the form of the question the Robinsons' attorney used to elicit that information. The evidentiary rules require specificity in objections so that the objecting party's concerns may be properly addressed by the court. Because the only objection raised to this portion of Dr. Huff's testimony was to leading, the trial court could not have ruled on the admissibility of the evidence based upon a failure to comply with Tenn. R. Civ. P. 26.05. Having not raised that specific objection at the trial level, the Hospital cannot be heard to complain on appeal.

It is incumbent upon a party to take whatever action is reasonably available to prevent or nullify the harmful effects of an error. Tenn. R. App. P. 36(a). With that in mind, even if we assume, *arguendo* (which we do not), that the trial court erred in allowing Dr. Huff to testify as to the causal connection between the ulcers and the fracture, we note that Dr. Huff's May 17, 2005 letter, which contains the very opinion of which the Hospital now complains, was moved into evidence by the Hospital's own attorney.

## Improper Arguments and Statements by Plaintiffs' Counsel

The Hospital next asserts that its motion for new trial should have been granted based upon allegedly improper comments and arguments by the Robinsons' counsel during voir dire and in the closing argument. Before addressing the specific statements made, we first note that, in general, control over the argument of counsel resides with the trial court, and the trial court has broad discretion as to what shall and shall not be permitted in argument. *McCollum v. Huffstutter*, No. M2002-00051-COA-R3-CV, 2002 WL 31247077, at *9 (Tenn. Ct. App. Oct. 8, 2002). The appellate courts generally will not interfere with the discretionary action of a trial court in refusing to grant a mistrial or a new trial for misconduct of counsel in argument unless the argument is clearly unwarranted and made purely for the purpose of appealing to passion, prejudices and sentiment which cannot be removed by sustaining the objection of opposing counsel, *see Perkins v. Sadler*, 826 S.W.2d 439, 442 (Tenn. Ct. App.1991), or unless the appellate court finds affirmatively that the arguments or statements affected the result of the trial. *See, e.g., Pullman Co. v. Pennock*, 118 Tenn. 565, 102 S.W. 73 (1907).

Voir Dire Statements

-19-

On appeal, the Hospital cites three portions of the voir dire, and asserts that the line of questioning used by the Robinsons' attorney was for the sole purpose of appealing to the jury's sympathies and prejudices. The first allegedly improper comment made by Plaintiffs' counsel is as follows:[3]

> This is a civil case. Nobody is going to jail, or nobody is going to be executed, nobody is going to be taken away from their family or lose their job, no matter what your decision is in this case, whether it's for the Plaintiffs, my clients, or whether it's for the Defendant, Baptist Hospital....

Immediately following this statement, Plaintiffs' counsel begins to question the jury on the applicable burden of proof in the case. It is not until two pages later in the transcript that the Hospital's attorney objects. At the bench conference, the Hospital's attorney couched his objection as follows:

> MR. KIRBY: The first thing, I let it go by, was he told them don't worry about a judgment in this; it won't affect anybody or hurt the Defendant; nobody will lose a job. I'm objecting to any more comments or arguments such as that....

From his own statement, counsel for the Hospital did not specifically object to the Plaintiffs' counsel's comments (set out above), which they now cite as erroneous; rather, Defendant's counsel is objecting to "any more comments or arguments such as that." The trial court overruled the objection and stated that it "will allow [Plaintiff's counsel] to see if any juror has a bias against returning a money damage." Even if we assume, *arguendo*, that the Hospital's objection was timely made and that it was sufficiently specific, we nonetheless conclude that it was not error for the trial court to allow Plaintiffs' attorney to question the potential jurors about any bias they might have, which would make it difficult for them to award damages in this case.

When Plaintiffs' counsel questioned the jurors about concerns over insurance premiums, the trial court sustained the objection made by the Hospital's attorney, to wit:

> MR. AGEE [counsel for the Robinsons]: Okay. Is there anybody that would be reluctant to return a fair award to Mr. Robinson simply because they would be afraid that their health insurance premiums would go up?
>
> MR. KIRBY [counsel for the Hospital]: Objection.

---

[3] In order to place the allegedly inflammatory comments in their proper context, we have included more of the transcript of the evidence than the Appellant includes in its brief.

THE COURT: Yes, sir.

[Bench conference]

MR. KIRBY: Your Honor, he's now asking them if they are afraid to return an award for the Plaintiff if they think his health insurance premiums would go up.  The man is insured by Medicare and TennCare.  It's improper.  Now, if I'm going to be permitted to prove that this man incurs no expenses because of his insurance, I'll do that.  Mr. Agee is trying to do the opposite.

THE COURT: Mr. Agee.

MR. AGEE: Judge, I'd like to respond to that.  I'm not directing the question at all about whether or not this man, my client, had insurance or not or is making a claim for reimbursement.  I'm simply asking the question to determine if they would be reluctant because they had either been told or would suspect that their insurance would go up if they returned a verdict.  If they were to consider that, they couldn't give my client a fair verdict in this case.

\*                                    \*                                    \*

THE COURT: I didn't know the hospital issued insurance.

MR. AGEE: I don't know if the hospital does.  I'm not talking about the hospital.  I'm talking about if they would think generally that their insurance rates would go up or the cost of medical care would go up because there's a claim.  You see it on TV all the time.

THE COURT: You didn't ask about medical care.  You asked about insurance.

After sustaining this objection, the trial court made the following statement to the jury:

Ladies and gentlemen, I know that we're just going through the selection process at this time, but the Court sustains the objection with regard to the last question, and you don't have to respond to that.

 Because the objection was sustained, the only thing the potential jurors heard about rising insurance rates was what was contained in Mr. Agee's initial question, *supra*. Looking at the objectionable question in the context of the voir dire proceedings, we cannot conclude that the question asked by Mr. Agee prejudiced either the jury pool, or the Hospital's case.  In fact, as the question was left in

the wake of the objection (without follow up or a chance to answer), it more likely could have prejudiced the Robinsons' case if the jury pool otherwise would not have thought about potential rising insurance premiums based on a verdict against the Hospital. At any rate, given the fact that the objection was sustained, and with the explanatory language used by the trial court, we cannot conclude that this question alone rises to the level of reversible error.

Following the granting of the Hospital's objection to the previous question, Plaintiff's counsel continued his questions as follows:

> MR. AGEE: Okay, I will ask all of you as a collective body, would any of you be afraid to or reluctant to render a fair verdict, even if it meant a huge personal injury money damage award, simply because you would be afraid your medical costs to you at the hospital would go up?
>
> MR. KIRBY: Your Honor, objection.
>
> THE COURT: The Court will allow that question.

Although the trial court overruled the objection, he cautioned the jury as follows:

> Ladies and gentlemen, basically what we're trying to find out is if there is any reason you can't be a fair and impartial juror; if the proof shows the Plaintiff is entitled to an award, give an award that is fair and adequate; if the proof shows the Defendant is entitled to an award, give an award for the Defendant, and he's trying to find out if there's any reason you couldn't give an adequate award if, in fact, the proof shows it....

Closing Argument

The Hospital also cites error with the Plaintiffs' closing argument. Specifically, the Hospital asserts that the argument was outside the scope of Plaintiffs' theory and the evidence adduced at the trial. Concerning the theory of the case, Plaintiffs' counsel made the following, relevant, statements in his closing:

> This case is, my feeling, not about bad nurses. This case is about a corporation, Baptist Memorial Hospital. That, if you remember Ms. Bohannon, she's very honest, and these ladies that are seated in the courtroom today, all these ladies are very nice, very good nurses.

-22-

But these nurses were placed in an environment where they were required to perform a lot of work and do a lot of things for the company, you know, and sometimes there is not enough time to go around. And we're not suggesting at all that the nurses did anything intentionally to hurt Mr. Robinson or would any patient or ever would.

Nurses, it's a very honored profession. As a matter of fact, this is my brother-in-law, he's a nurse; my sister is a nurse, and I've had a lot of family members in the health care field. So I want to tell you, first of all, this is not a case about bad nurses or bad nursing in general. This is a case, as I said, where there are just so many hours in a day and just so many rooms you can enter in a day.

\*                                    \*                                    \*

You know, it's important for the hospital in this case. You know, I notice that they sent these nurses. These nurses are here. They have enough interest to be here. They're not even named parties to the lawsuit.

I've never seen one administrator from Baptist Hospital in this courtroom during the entire three days of the trial. It's the administration that hires the nurses; it's the administration that provides enough nursing staffing for the patients in the hospital, and it's the administration that decides what cost containments [sic] they want to make and how they want to treat their patients. So I'm quite surprises that we don't have anybody from administration at the hospital–from the hospital in the courtroom.

On appeal, the Hospital contends that these statements constitute a new theory of the case (i.e. corporate negligence on the part of the Hospital) when the theory throughout the trial was negligence on the part of the nursing staff, which theory implicated the Hospital through the doctrine of *respondeat superior*. We first note that counsel for the Hospital did not raise an objection after any of the above statements. However, even if we assume, *arguendo*, that the objection was preserved for appeal, we nonetheless conclude that this line of argument did not prejudice the Hospital's case. Furthermore, there is evidence in the record to support this argument that the nurses were overworked at certain times, to wit:

Q [By Plaintiffs' counsel to Kay Bohannon, L.P.N. on duty during some of Mr. Robinson's hospital stay]: All right. Have there been times or–in February of '02, was it–were there times when you had

-23-

a lot of people hollering at you and it was hard to get everything done?

A. That can happen any day, so it's just as likely to happen then as it would be tomorrow or yesterday.

Q. Have you had as many as sixteen people hollering at you at one time, trying to get something done?

A. Oh, sure. Sure. Because you don't just do for your patients. You do for who needs.

Q. Okay. So you may have to do–is it then you may have to do something for somebody other than your patient, correct?

A. Certainly.

*                          *                          *

Q. Let me ask you this: Are certain nurses assigned to certain patients during their stay there?

A. Yes, sir.

Q. Okay. That's what I thought. In other words, you're not responsible for every room on that floor?

A. Not totally responsible, no, sir.

Q. But sometimes you're taken away from your room to help somebody with their room, correct?

A. Exactly.

Q. And that was true in February of '02, wasn't it?

A. That's always been true, yes.

We note that no objection to the line of questioning used by Plaintiffs at trial was lodged by the Hospital. Given the evidence adduced at the trial, the arguments made by Plaintiffs' counsel during argument are not outside the record. While the crux of Plaintiffs' case is their contention that the nursing staff did not take adequate precautions with Mr. Robinson given his particular medical problems, the reason why the nurses allegedly did not properly care for Mr. Robinson is not the

gravamen of the case. Whether by plain negligence on the part of the nurses, or negligence brought about by under-staffing or disorganization within the organization, the bottom line is whether the care given to this particular patient was adequate. In fact, by stating that "[t]his case...is not about bad nurses," the Plaintiffs risk doing more harm to their own case than to the Defendant's. Having traveled at trial under the theory that the nurses provided inadequate care, and to only hint at the Hospital's administrative shortcomings during that proceeding, the Plaintiffs' decision, at the closing, to state that Mr. Robinson's outcome is not about bad nurses is, in the opinion of this Court, to risk damaging their case by instilling too much sympathy for the nursing staff.

The Hospital next asserts that, during his closing, Plaintiffs' attorney argued facts that were not in evidence, to wit

> You know, you heard one of the nurses testify that she would have known it [i.e. that Mr. Robinson had heel ulcers] because she would have smelled it or she would have felt it. Well, you know, if it was in the state that it became, that it progressed to on March 20 or 21, when Dr. Chu at the Wound Care Clinic took those photographs. Now, to be totally honest, when these nurses gave their depositions, nobody ever said they saw or checked his heels. Now, at some time before this trial–
>
> MR. KIRBY: Your Honor, I object. Their depositions are not in evidence. It's what the nurses said from the witness stand.
>
> MR. AGEE: Okay.
>
> THE COURT: All right. The jury will have to consider the testimony heard here in court. Any depositions that may have been read to the live witnesses were for purposes of you to determine whether a prior inconsistent statement was made....

With the curative instruction, and in the context of the entire record, we find that this portion of the Plaintiffs' argument did not prejudice the jury to such an extent as to warrant a new trial.

The Hospital also takes issue with certain statements made by Plaintiffs' counsel during his rebuttal argument, to wit:

> I want to talk about the contradictions in this case. You know, one contradiction Mr. Kirby forgot to tell you about was Dr. Katz [the Hospital's expert]. Dr. Katz contradicted every treating doctor that laid hands on Mr. Robinson from the day he developed his ulcers until he was released.

-25-

Now, you know, you decide what weight to give Dr. Katz and Dr. Chu...and Dr. Huff. But I suggest to you that what's strange to me is that they [the Hospital] have to go down to Jackson, Mississippi. You know, Baptist Hospital is headquartered in Memphis, Tennessee, **and they're a very powerful, very able, financially strong company with**–

MR. KIRBY: Your Honor, I object. That's inappropriate.

THE COURT: All right. The objection–

MR. AGEE: I will withdraw the financial, Judge.

THE COURT: All right, sir. Please.

MR. AGEE: They are a company, and–

MR. KIRBY: Well, I also object because this hospital here in Ripley is its own non-profit self, and it's not–it's a separate, independent corporation.

THE COURT: All right, sir.

(Emphasis added).

While we concede that Mr. Agee's statement concerning the financial strength of the Hospital should not have been allowed (which it was not), we do not find that the statement was made purely for the purpose of appealing to passion, prejudices and sentiment of the jury. *See Perkins v. Sadler*, 826 S.W.2d 439, 442 (Tenn. Ct. App.1991). Taken in context, it appears that, with this line of argument, Mr. Agee was reiterating his trial position that a Hospital as large as Baptist, with its corporate headquarters in a city as large as Memphis, had to go to Jackson, MS to find an expert to support its position. Even if the argument was inflammatory, we find that any harm was removed by the withdrawal of the question and the subsequent statements made by Mr. Kirby. Furthermore, when the trial court charged the jury, he reminded them that they "must not be influenced by any personal likes or dislikes or any personal prejudice or any personal sympathy. You must decide the case solely on the evidence before you and according to the law." The jury was also cautioned that the arguments of counsel are not proof. From the totality of the circumstances, we cannot conclude that these statements, when viewed in their context and in light of the entire record, rise to the level of reversible error.

**Sufficiency of the evidence and amount of damages awarded**

On appeal, the Hospital asserts that the jury's verdict should be vacated because there is no

material evidence to support the verdict. Our review of the judgment entered on the jury's verdict is governed by Tenn. R.App. P. 13(d), which provides that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Under this standard of review, we "are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict." *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn.1978). In making this determination, we are "required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary." *Id*. If the record contains any material evidence to support the verdict, we must affirm the trial court's judgment. *See id.*; *accord Forrester v. Stockstill*, 869 S.W.2d 328, 329 (Tenn.1994). Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trier of fact who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn.1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn.Ct.App.1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.*; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997).

The Hospital contends that, "Plaintiffs advanced the theory throughout the trial that the case was not about nursing negligence but about the hospital failing to hire a sufficient number of nurses to improve its financial standing...." As discussed above, in the examination of Nurse Bohannon the Plaintiffs adduced testimony from which a reasonable jury could conclude that there was not enough nursing staff during the period of time at issue. However, during the course of the proceedings (and in their argument, *supra*), Plaintiffs use this information to infer that the nursing staff was overworked and, therefore, not available to provide the necessary care that Mr. Robinson, with his medical issues, required. However, based on the evidence before us, we cannot conclude that the Plaintiffs asserted a theory that the Hospital failed to hire sufficient number of nurses in order to improve itself financially. What is in evidence is the testimony of Dr. Huff and the deposition testimony of Dr. Chu. Both of these doctors opine that Mr. Robinson's heel injuries would not, and should not, have occurred had he received the level of care required for a patient in his physical state. Even Dr. Katz, the Hospital's own expert, testified that, although some decubiti are not preventable, "to get bilateral decubiti or bilateral pressure ulcers in a heel in a patient who otherwise is mobile, like this guy was, I would think that that would not be–that would not be good care...."

Although the nurses all testified that Mr. Robinson did not have pressure sores on his heel when he left the Hospital, the medical records kept by the nurses contain no notes concerning any preventative measures taken to avoid heel pressure. Furthermore, their testimony is rebutted by Dr. Huff's testimony that he saw the heel injuries prior to discharging Mr. Robinson from the Hospital. From our review of the entire record, we conclude that there was material evidence on which the jury could have based its decision.

-27-

Turning to the award rendered in this case, the Hospital asserts that the $300,000 awarded to Mr. Robinson and the $50,000 awarded to Mrs. Robinson is not "within the range of reasonableness." We disagree. In ***Thrailkill v. Patterson***, 879 S.W.2d 836 (Tenn. 1994), our Supreme Court recognized that, in certain cases, "it is the jury's special province to evaluate damages and that a life cannot be defined with 'mathematical precision'." *Id*. at 843. The ***Thrailkill*** Court further stated that:

> In ***Wolfe v. Vaughn***, 177 Tenn. 678, 688, 152 S.W.2d 631, 635 (1941), this Court stated that the "amount fixed by the jury and concurred in by the trial judge will be accepted upon appeal unless there is something to show a violation of the discretion" of the trial judge. We have also said that a jury verdict that has the trial judge's approval is entitled to "great weight," ***D.M. Rose & Co. v. Snyder***, 185 Tenn. 499, 525, 206 S.W.2d 897, 908 (1947), and that the appellate court "rarely ever" disapproves damages set in this manner. ***McClard v. Reid***, 190 Tenn. 337, 343, 229 S.W.2d 505, 507 (1950). We again emphasized the responsibility of the trial judge in determining whether the amount fixed by a jury is excessive: After he has approved the verdict it is our duty not to disturb it unless it is evident that he failed to keep the jury within reasonable bounds.

***Thrailkill***, 879 S.W.2d at 840.

Here, the proof concerning damages is largely undisputed in the record. Mr. Robinson and his wife testified that, despite a myriad of physical problems that existed prior to the heel ulcerations, Mr. Robinson could perform odd jobs, that he enjoyed playing with his grandchildren, and was able to do yard work. Prior to developing the decubitus ulcers, Mr. Robinson testified that his enjoyment of life was about seventy percent (70%); after the injuries, he testified that his enjoyment of life had dropped to thirty percent (30%). Mrs. Robinson corroborated her husband's testimony when she testified that, prior to the problems with his heels, Mr. Robinson was a "busy and independent man," but since the injuries, she has to "wait on him hand and foot." The record contains material evidence that Mr. Robinson suffered painful injuries with permanent effect. He was required to undergo painful, and prolonged, treatment including numerous debridements of the necrotic tissue. The evidence shows that, although the wounds ultimately healed, the required debridements caused permanent loss of Mr. Robinson's heel pads. The evidence shows that, because of his injuries, it is now necessary for Mr. Robinson to wear braces and corrective shoes in order to avoid further injury to his feet. Based upon the evidence before us, we find that the jury's verdict is full and somewhat generous but within the range of reasonableness given the nature and extent of Mr. Robinson's injuries and the lifestyle changes stemming therefrom.

For the foregoing reasons, we affirm the judgment of the trial court entered upon the jury verdict in this case. Costs of this appeal are assessed against the Appellant, Baptist Memorial Hospital of Lauderdale County, and its surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.